J-S45016-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.R.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.B., FATHER | : | |
| | : | |
| | : | No. 1240 MDA 2024 |

Appeal from the Decree Entered July 29, 2024
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9550

| | | |
|---|---|---|
| IN THE INTEREST OF: M.B.B., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: M.B., FATHER | : | |
| | : | |
| | : | No. 1241 MDA 2024 |

Appeal from the Decree Entered July 29, 2024
In the Court of Common Pleas of Luzerne County Orphans' Court at
No(s): A-9551

BEFORE:  OLSON, J., DUBOW, J., and McLAUGHLIN, J.

MEMORANDUM BY DUBOW, J.:          **FILED: FEBRUARY 5, 2025**

M.B. ("Father") appeals from the July 29, 2024 decree entered in the Luzerne County Court of Common Pleas that granted the petition to terminate his parental rights to twelve-year-old M.B.B. and eleven-year-old B.R.B. (collectively, "Children") that was filed by Children's mother, A.L. ("Mother"), and her husband, N.L. ("Stepfather").  Upon careful review, we affirm.

In its October 7, 2024 opinion, the trial court set forth a thorough and accurate procedural and factual history, as well as findings of fact and a summary of testimony, which we adopt for purposes of this appeal. *See* Trial Ct. Op., filed 10/7/24, at 1-5, 8-26, 29-31. In sum, Father has a history of alcohol and drug abuse. Mother and Father lived together and were in a romantic relationship until March of 2014, when M.B.B. was two years old and B.R.B. was two months old. Neither party filed for custody. For the remainder of 2014, Children lived with Mother. Father visited Children at their paternal grandmother's ("Paternal Grandmother") home and visits ranged from fifteen minutes to one hour long. From 2015 until 2018, by agreement of the parties, Children visited Father overnight on two to four weekends per month. Mother would often provide the Children's essentials for these visits, including food, diapers, wipes, clothes, and blankets.

In 2018, an incident occurred which changed Mother's willingness to agree to overnight visitation. Mother went to pick up Children at Father's home and found Father and his then-paramour unconscious and unable to care for Children due to suspected drug use. Children were five and three years old at the time. Mother removed Children from Father's home, and it was not until three hours later that Father called Mother to ensure that she had the Children. As a result of this incident, Mother no longer permitted Father to have unsupervised visitation but continued to initiate contact with Father and allowed Father to have supervised visits at her home.

Father subsequently moved from Plains, Pennsylvania, to Delaware. From 2018 to May 1, 2021, Father visited Children once or twice per month, as well as holidays, supervised at Mother's home. According to Mother, Father was always initially excited to see Children but would often fall asleep on the couch within a half hour of arriving. Father consistently denied drug use when confronted by Mother.

On Christmas of 2020, Father was visiting Children at Mother's house when M.B.B. pulled a bag of white powder and a spoon from Father's backpack. When Mother confronted him about drug use, Father claimed that the white powder was sugar. Despite her concerns, Mother continued to initiate contact between Children and Father, and supported visitation between Children and Father's extended family.

The last contact that Father had with Children was in May of 2021 at M.B.B.'s little league baseball game. Father and his paramour arrived at the game highly intoxicated, were loud and belligerent, and made a scene that caused other parents to remove their children from Father's vicinity. As a result of Father's behavior, M.B.B. was embarrassed and sobbing. After that incident, Mother stopped initiating contact between Children and Father and left it up to Father to initiate contact on his own. Father has not seen Children since that day.

Father was arrested for driving under the influence and, six months later, Father underwent treatment for alcohol addiction at an inpatient rehabilitation center for one month. Father called Mother in November 2021

to tell her that he completed the program and was "going to kick [her] door in" and take Children. N.T. Hr'g 4/15/24, at 27. Mother told Father that he could see Children whenever he wanted in a supervised public setting. Father subsequently relapsed and did not contact Mother for approximately two years. Father called Mother in July and October of 2023, both times to complain about his child support obligation to her. On July 3, 2023, Father moved from Delaware to New York to live with his mother.

Mother and Stepfather began dating in 2015 and have been married since 2019. Mother and Stepfather live in a home with Children, their two younger siblings that Mother and Stepfather had together, and a niece that the couple is caring for. Mother works during the day and Stepfather is a disabled veteran. Mother and Stepfather share duties such as getting Children ready in the morning, making meals for Children, and putting Children to bed. Stepfather drives Children to and from school every day. Mother and Stepfather share duties taking Children to medical and dental appointments and both attend school conferences for Children. Stepfather helps Children with their homework after school, takes them to sports practices, and coaches football and baseball for Children. Stepfather also helps with Children's wrestling team. Children call Stepfather "Dad" and call Father "Big Mike."

On October 4, 2023, Mother and Stepfather filed a petition to terminate Father's parental rights. The trial court appointed Marsha Basco, Esq., to serve as Children's legal counsel and guardian *ad litem* after finding that the dual role did not pose a conflict. The trial court held hearings on April 15,

2024, and May 10, 2024. Mother and Stepfather testified on their own behalf. Father testified on his own behalf and presented testimony from Paternal Grandmother as well as Children's paternal grandfather ("Paternal Grandfather"), and Children's paternal aunt ("Paternal Aunt").

In sum, Mother and Stepfather testified in accordance with the above-stated facts. Addititionally, Mother testified that M.B.B., who is twelve years old, has expressed consent to be adopted by Stepfather. Mother testified that Stepfather has a strong bond with Children and that "[h]e's there every day for them. Not only for the sports, the homework, the doctor appointments, but he's also there as someone they can confide in and talk to and trust and someone they enjoy spending time with." N.T. Hr'g 5/10/24 at 54. Mother testified that Stepfather thinks of Children as his sons and introduces them that way. Mother explained that Children view Stepfather as "the father in their life." *Id.* at 44-45. Finally, Mother testified that right after the incident in May of 2021, Children asked why Father acted that way. However, Mother explained, since 2022 and 2023, Children have not asked about Father and have not asked to see Father.

Paternal Grandmother, Paternal Grandfather, and Paternal Aunt testified, *inter alia*, that Father was consistently involved in Children's lives prior to May of 2021. Additionally, Children's Paternal Grandmother and Paternal Aunt testified that Father had a bond with Children.

Father testified that he moved to Delaware in 2017 for a job opportunity with a construction company and, at the time of the move, he had a good

relationship with Children. He stated that he would communicate with Mother throughout the week regarding Children's school and extra-curricular activities. Father testified that he did not have a vehicle but, after three months, he started dating someone who was willing to drive him to Pennsylvania and he would come to visit Children every weekend. Father further testified that, during that time, he also saw Children on holidays and birthdays. Father explained that he would stay in hotel rooms or, sometimes, Mother would let him stay at her house to see Children.

Father admitted to using cocaine in 2017 and 2018 when he was residing in Delaware but explained that he still consistently visited Children.

Father recalled the baseball game incident in May of 2021, and testified that "[i]t was a shameful day for me. You know, I made a fool of myself and embarrassed my son." N.T. Hr'g 4/15/24 at 147. He further testified that that day in 2021 was the last time that he saw Children and acknowledged that subsequently in 2021, he was arrested for DUI and subsequently lost his license.

Father testified that six months later, his employer paid for him to enter an inpatient rehabilitation program where he stayed for a month. He testified that he called Mother several times from rehab and that she was supportive of him seeing the kids again once he completed the program.

Father testified that he lost his job in February of 2022 and during that same time, he relapsed.

Father admitted that between June of 2021 and October of 2023, he did not have any visits with Children but testified that he attempted to call them. Father testified that Mother changed her telephone number three times, but he got the most recent telephone number from Paternal Grandmother and tried to call Mother four times in 2023, but she only answered one time. Father testified that he called Mother, asked about seeing Children, and tried to "explain to her that I haven't been around because you haven't let me." *Id.* at 159. Father also admitted that from June of 2021, until October of 2023, he did not have contact with Children's school or Children's pediatrician, and that he did not know the name of their doctor. Father testified that even though Paternal Grandfather advised him to file for custody of Children, he could not do that because he did not have a vehicle to drive to Pennsylvania and he did not have the financial means for an attorney.

Father testified that he has been sober for seven months. He further testified that he has a bond with Children and stated, "I love them to death." N.T. Hr'g, 5/10/24, at 67. When asked what he thought the effect of not seeing him has been on Children, he replied, "I'm sure it's not good for them. It's not . . . . Just having that role-playing in their mind of where's dad and how come he's not here. You know, I just wish – you know, I can – I could be. I wish I could be. It wasn't my choice." *Id.* at 71. Father stated that he wants to be in Children's lives and would be "crushed" if his parental rights were terminated. N.T. Hr'g 4/15/24 at 161. Father testified that he did not want the court to terminate his parental rights to Children and stated:

> I may have had some ups-and-downs, but I was always there for them. I always try my best just to be a part of their lives. So terminating my parental rights is not the answer. I think it's far from their best interest to be stripped from their life and my whole side of my family's and that whole part of their life. It's not fair to me and it's not fair to them.

*Id.*

Finally, the GAL recommended that it was in Children's best interest to terminate Father's parental rights.

At the conclusion of the hearings, the trial court terminated Father's parental rights to Children pursuant to Section 2511(a)(1) and (b).

Father timely appealed. Both Father and the trial court complied with Pa.R.A.P. 1925.

Father raises the following issues for our review:

1. Did the trial court err and commit an abuse of discretion in terminating the parental rights of [Father] to B.R.B, and M.B.B. pursuant to 23 Pa. C.S.[] § 2511(a)(1), where [Mother and Stepfather] failed to meet their burden of proving that [Father] evidenced a settled purpose of relinquishing his parental claim or that he failed to perform parental duties with regard to the child for the requisite six (6) months immediately prior to the filing of [Mother and Stepfather]'s petition?

2. Did the trial court err and commit an abuse of discretion in determining that the termination of the [Father]'s parental rights was in the best interests of [C]hildren's developmental, physical, and emotional needs and welfare without sufficient evidence?

Father's Br. at 5.

In cases involving the involuntary termination of parental rights, this Court's review is limited to determining whether the trial court's conclusion is supported by competent evidence. *In re Adoption of L.A.K.*, 265 A.3d 580,

- 8 -

591 (Pa. 2021). When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id*. (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted).

We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. We give great deference to the trial courts "that often have first-hand observations of the parties spanning multiple hearings." *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

It is axiomatic that "[p]arents enjoy a fundamental right to make decisions regarding the care, custody[,] and control of their children." *L.A.K.*, 265 A.3d at 591. "It cannot be denied that significant and permanent consequences for both the parent and child can follow the termination of parental rights, as there is an undeniable importance in a child's relationship with a biological parent." *Id.* Accordingly, "[i]n recognition of the gravity

attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence; that is, evidence that is so clear, direct, weighty and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* at 592 (citations and internal quotation marks omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. § 2511, governs termination of parental rights, and requires a bifurcated analysis. *In re Adoption of A.C.*, 162 A.3d 1123, 1128 (Pa. Super. 2017). "Initially, the focus is on the conduct of the parent." *Id.* (citation omitted). As discussed above, "[t]he party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *Id.* (citation omitted). If the court determines that the parent's conduct warrants termination of his or her parental rights, the court then engages in "the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *Id.* (citation omitted).

Moreover, we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2008).

Here, we concentrate our analysis on subsection 2511(a)(1). Section 2511(a)(1) provides that the trial court may terminate parental rights if the Petitioner establishes that "[t]he parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties." 23 Pa.C.S. § 2511(a)(1). The focus of involuntary termination proceedings is on the conduct of the parent and whether that conduct justifies a termination of parental rights. *In re B.L.L.*, 787 A.2d 1007, 1013 (Pa. Super. 2001). Although the statute focuses on an analysis of the six months immediately preceding the filing of the petition, the court must consider the whole history of a given case and may consider a parent's inaction before the six-month statutory provision. *K.Z.S.*, 946 A.2d at 758. "Although courts are to avoid the mechanical application of the Adoption Act, we may not ignore that the General Assembly has drawn focus to the six months immediately preceding the filing of the termination petition [and] the most critical period for evaluation is the six months immediately preceding the filing of the termination petition." *L.A.K.*, 265 A.3d at 592.

This Court has repeatedly defined "parental duties" in general as the affirmative obligation to provide consistently for the physical and emotional needs of a child:

> Parental duties are not defined in the Adoption Act, but our courts long have interpreted parental duties in relation to the needs of a

- 11 -

child, such as love, protection, guidance and support. Parental duties are carried out through affirmative actions that develop and maintain the parent-child relationship. The roster of such positive actions undoubtedly includes communication and association. The performance of parental duties requires that a parent exert himself to take and maintain a place of importance in the child's life. Fortitude is required, as a parent must act with reasonable firmness to overcome obstacles that stand in the way of preserving a parent-child relationship and may not wait for a more suitable time to perform parental responsibilities.

*Id.* (internal citations and quotation marks omitted).

It is well-settled that "a parent's efforts are always considered in light of existing circumstances." *Id.* (citations and internal quotation marks omitted). "To that end, even where the evidence clearly establishes a parent has failed to perform affirmative parental duties for a period in excess of six months as required by Section 2511(a)(1), the court must examine the individual circumstances and any explanation offered by the parent to determine if that evidence, in light of the totality of circumstances, clearly warrants permitting the involuntary termination of parental rights." *Id.* at 593 (citations and internal quotation marks omitted).

Our Supreme Court has explained:

Consideration of the totality of the circumstances includes evaluation of the following: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between the parent and child, if any, including any efforts made by the parent to reestablish contact with the child; and (3) the effect that termination of parental rights would have on the child pursuant to Section 2511(b). . . . It is within this framework that a court determines whether a parent has faced barriers that prevented the parent from maintaining the parent-child relationship. What constitutes a "barrier" in the context of a Section 2511(a)(1) analysis is a finding within the discretion of the trial court, and

- 12 -

what may constitute a barrier necessarily will vary with the circumstances of each case.

*Id.*

In his first issue, Father avers that the trial court abused its discretion when it terminated Father's parental rights pursuant to Section 2511(a)(1). Father's Br. at 9. Father argues that the record reflects that he "made consistent and genuine efforts to maintain contact with [C]hildren and be a meaningful presence in their lives, despite substantial barriers created by Mother." *Id.* at 9-10. Father argues that, after attending rehab, he made multiple attempts to contact Mother and resume visitation with Children, which Mother repeatedly declined. *Id.* at 12. Father further argues that the trial court failed to consider the testimony from Paternal Grandmother and Paternal Aunt that Father was consistently involved in Children's lives prior to 2021 and had a bond with Children. *Id.* at 13. Finally, Father argues that the trial court erred when it believed Mother's testimony over the testimony of Father and his family. Essentially, Father raises a challenge to both the weight of the evidence as well as the trial court's credibility determinations, both of which fail to garner him relief.

The trial court found that the "unrebutted testimony is that since May 2021 until the present, Father has not had any contact with Children." Trial Ct. Op. at 26. The trial court then considered Father's explanation for his conduct including Father's substance abuse, financial difficulties, transportation issues, and his claim that Mother repeatedly denied him access

to Children. *Id.* at 22-26. The trial court found that Father's substance abuse had an impact upon his lack of contact with Children. The trial court opined:

> Subsequent to the May of 2021 incident regarding Father's erratic behavior at the baseball game, Father waited six (6) months before he sought treatment for his substance abuse. During these six (6) months, he did not contact Mother to see the children. Then subsequent to Father seeking treatment, Father relapsed for one to two years before he sought treatment again. Between May of 2021 and October of 2023, over two (2) years passed without Father having any contact with [C]hildren. Father did not exercise his affirmative duty as a parent to maintain contact with [C]hildren during these three years.

*Id.* at 27.

The court also found Mother's testimony to be more credible than Father's regarding Father's efforts to maintain contact with Children. *Id.* at 26. While Father testified that he repeatedly contacted Mother to request visitation with Children, Mother testified that Father only contacted her three times. *Id.* at 27-28. Moreover, while Father claims that Mother was a barrier to reunification with Children, the court found that Father failed to utilize alternative means to facilitate contact with Children, including making efforts to file a complaint for custody. The court opined:

> Father had other means to contact [C]hildren. Father knew the location of [Children]'s residence. Father could have utilized the courts to exercise his custodial rights of [C]hildren. He could have filed a petition in court requesting to see [C]hildren and have Mother served at her residence. Father claimed that he had problems with his vehicle. However, he could have reached out to a family member to drive him to the courthouse to file documents or researched online to find filing forms for *pro se* documents. He could have simply mailed his complaint for custody for filing and had a hearing scheduled without the need of a vehicle. He would have even been able to attend a custody, hearing via Zoom

- 14 -

without even leaving New York. All Father had to do was either call the courthouse or research the court's family court forms online. All Father had to do was try.

*Id.* at 26. The trial court considered the entire history of the case and concluded that Father failed to exercise reasonable firmness in maintaining contact with Children. The court opined:

In examining and considering the history of the case and carefully examining Father's circumstances, it is obvious to this Court that Father did not exercise reasonable firmness in seeing his children throughout the history of this case specifically subsequent to the incident at his son's baseball game in May of 2021. Father seemed to only exercise a passive interest in the children. Father had a positive duty -- requiring him to have an affirmative performance as a parent. Father needed to exert himself to take, and, maintain a place of importance in the children's life. Father could have sent the children letters, birthday cards and/or Christmas cards. Father was aware of Mother's address.

*Id.* at 27. After considering Father's explanations for his conduct, the court concluded "Father did not provide sufficient reasons for his inability to perform his parenting duties during the relevant six-month period and beyond." *Id.* at 28.

Upon review, the record supports the trial court's findings. We decline to reweigh the evidence or usurp the trial court's credibility determinations. Accordingly, we find that the trial court did not abuse its discretion when it terminated Father's parental rights pursuant to Section 2511(a)(1).

Father next avers that the trial court abused its discretion when it terminated Father's parental rights pursuant to Section 2511(b). Father's Br. at 15. Father argues that the trial court failed to consider testimony from Father, Paternal Grandmother, and Paternal Aunt that Father has a bond with

- 15 -

Children and failed to consider Father's efforts to reconnect with Children. *Id.* at 14-15. Father further argues that termination of parental rights would cause further emotional harm to Children. *Id.* at 15.

With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. This Court reviews "whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010). It is well settled that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005).

"One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond" that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond." *In re Adoption of N.N.H.*, 197 A.3d 777, 783 (Pa Super. 2018) (citation omitted). The fact that a child has a bond with a parent does not preclude the termination of parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. *Id.* at 898. Moreover, the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive

resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). Notably, "in cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re Q.R.D.*, 214 A.3d 233, 243 (Pa. Super. 2019) (citation omitted).

Father's arguments ignore the undisputed fact that Father has been absent from Children's lives since May of 2021. The trial court found that Stepfather is the one that meets Children's physical needs by getting Children ready for school, taking Children to and from school, preparing meals for Children, putting Children to bed, and taking Children to medical and dental appointments. Trial Ct. Op. at 29. The court further found that Stepfather meets Children's developmental needs by attending school conferences, assisting with homework, coaching Children's sports teams, taking Children fishing, and playing outside with them. *Id.* The court also found that Stepfather meets Children's emotional needs by always being there for them to confide in. *Id.* at 30. The court credited Mother's testimony regarding Children's relationship with Stepfather and emphasized:

> Mother testified that from January of 2023 until October of 2023 [C]hildren did not ask to see their father and when they mentioned him, they referred to him as "Big Mike" and refer to Stepfather as "Dad." Mother also testified that her two sons assimilated with her other children, and all the children view themselves as siblings and get along together. Mother testified that her two [C]hildren

> also view Stepfather as their father in their life. Mother further indicated that her oldest son is twelve (12) years old and since his consent would be required for adoption, he does consent to Stepfather adopting him. Mother testified that she believes that Stepfather has a strong bond with her two [C]hildren. According to Mother, Stepfather is always there for [C]hildren, going to their sports activities, helping them with homework, attending their medical appointments, and is also there as someone that [C]hildren can confide in.

*Id.* at 30-31 (internal citation omitted). Based on the foregoing, the trial court found that it was in Children's best interest to terminate Father's parental rights pursuant to Section 2511(b). The court opined that "Mother and Stepfather have amply demonstrated that they continue to meet [C]hildren's physical, developmental, and emotional needs and that [C]hildren have thrived under their care. [C]hildren need and deserve a paternal figure in life that will supply proper nurturing, love, guidance and security." *Id.* at 32.

Upon review, the record supports the trial court's findings that a termination of Father's parental rights would be in Children's best interest. Based on the evidence that Children view Stepfather as "their father" and never ask about Father, it is reasonable for the trial court to infer that Children would not suffer emotional harm if Father's rights were terminated. The record supports the trial court's findings and, once again, we decline to reweigh the evidence or usurp the trial court's credibility determinations. Accordingly, we find no abuse of discretion.

Decrees affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/5/2025